A-489-842
Remand Redetermination
Slip Op. 22-12
Court No. 21-00045
**Public Document**
E&C/OII:  DJG

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**
**PC Strand from the Republic of Turkey**
*Celik Halat ve Tel Sanayi A.S. v. United States*
**Consol. Court No. 21-00045, Slip Op. 22-12 (CIT February 15, 2022)**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) issued in *Celik Halat ve Tel Sanayi A.S., v. United States*, Slip Op. 22-12,

Consol. Court No. 21-00045 (CIT 2022) (*Celik Halat*).  This action arises out of the final

determination in the less-than-fair-value (LTFV) investigation of *Prestressed Concrete Steel*

*Wire Strand from the Republic of Turkey:  Final Affirmative Determination of Sales at Less Than*

*Fair Value*, 85 FR 80001 (December 11, 2020) (*Final Determination*); *see also Prestressed*

*Concrete Steel Wire Strand From the Republic of Turkey:  Notice of Correction to the Final*

*Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 11724 (February 26, 2021).

The Court remanded to Commerce to determine a new estimated dumping margin for

Celik Halat without relying on section 776 of Tariff Act of 1930, as amended (the Act), with

respect to the filing of Celik Halat's response to the home and U.S. market sections (*i.e.*, sections

B and C, respectively) of Commerce's antidumping duty (AD) questionnaire.  After reopening

the record for Celik Halat to submit its response to sections B and C of the AD questionnaire,

Commerce has calculated Celik Halat's weighted-average dumping margin, per the Court's

remand order.  As a result, Celik Halat's revised weighted-average dumping margin is 17.88

percent.  Moreover, because Commerce is calculating a weighted-average dumping margin for

Celik Halat, instead of basing the company's margin on facts available pursuant to section 776 of

the Act, Commerce also revised the all-others rate for exporters and producers not individually

examined to be 17.88 percent, in accordance with section 735(c)(5) of the Act.

## II.    BACKGROUND

Commerce published the *Final Determination* on December 11, 2020.[1]  As discussed in

the *Final Determination*, because Celik Halat failed to submit all portions of its response to

sections B and C of Commerce's AD questionnaire by the established deadline, Commerce

found that the use of facts available was warranted pursuant to section 776(a) of the Act and that

Celik Halat failed to cooperate to the best of its ability to comply with a request for information,

within the meaning of section 776(b)(1) of the Act.  Consequently, Commerce assigned Celik

Halat the only margin alleged in the Petition[2] (*i.e.*, 53.65 percent), in accordance with section

776(b) of the Act and 19 CFR 351.308(a).  Moreover, pursuant to section 735(c)(5)(B) of the

Act, because there was only one estimated dumping margin in the Petition, Commerce also

assigned the Petition rate of 53.65 percent as the all-others rate.

In its February 15, 2022, opinion, the Court remanded the *Final Determination* to

Commerce, concluding that Commerce's rejection of Celik Halat's questionnaire response was

an abuse of discretion, and instructing Commerce to determine a new estimated dumping margin

---

[1] *See Final Determination*.
[2] *See* Petitioners' Letter, "Petition for the Imposition of Antidumping Duties Against Imports of Prestressed Concrete Steel Wire Strand from Argentina, Egypt, Colombia, Indonesia, Italy, Malaysia, the Netherlands, South Africa, Spain, Saudi Arabia, Taiwan, Tunisia, Turkey, United Arab Emirates, and Ukraine," dated April 15, 2020 (Petition).

for Celik Halat that does not resort to section 776 of the Act with respect to the filing of the company's response to sections B and C of the questionnaire.[3]

On February 18, 2022, we reopened the administrative record to permit:  (1) Celik Halat to file its response to sections B and C of the AD questionnaire; and (2) other interested parties to submit factual information to rebut, clarify, or correct this information.[4]  On February 22, 2022, Celik Halat filed its response to sections B and C of the AD questionnaire.[5]  On February 25, 2022, the petitioners[6] submitted comments on sections B and C of Celik Halat's questionnaire response.[7]  On March 1, 2022, Commerce issued to Celik Halat a questionnaire in lieu of performing an on-site verification.[8]  On March 10, 2022, Celik Halat submitted its response to this questionnaire.[9]

## III.   ANALYSIS

In accordance with the Court's instructions, we determined an estimated weighted-average dumping margin for Celik Halat based on its reported data.  We calculated this margin as discussed below.

---

[3] *See Celik Halat* at 30-31.

[4] *See* Commerce's Letter, Reopening the Administrative Record, dated February 18, 2022.

[5] *See* Celik Halat's Letter, "Response of Celik Halat ve Tel Sanayi A.S. ("Celik Halat") to the Sections B&C Questionnaire," dated February 22, 2022 (BCQR).

[6] The petitioners are:  Insteel Wire Products Company; Sumiden Wire Products Corporation; and Wire Mesh Corporation.

[7] *See* Petitioners' Letter, "Petitioners' Comments on Halat's Questionnaire Responses," dated February 25, 2022 (Petitioners' February 25 Comments).

[8] *See* Commerce's Letter, In-Lieu-of-On-Site-Verification Questionnaire, dated March 1, 2022 (ILV Questionnaire). Under section 782(i)(1) of the Act, Commerce shall verify the information relied upon in making a final determination in an AD investigation.  Normally, Commerce verifies information using standard procedures, including an on-site examination of original accounting, financial, and sales documentation.  However, due to travel restrictions in response to the global COVID-19 pandemic, Commerce is unable to conduct on-site verification of the information to be relied upon in this remand redetermination.  Accordingly, Commerce issued this questionnaire to verify the information through alternative means in lieu of an on-site verification.

[9] *See* Celik Halat's Letter, "AD Verification Response of Celik Halat ve Tel Sanayi A.S," dated March 10, 2022 (ILVQR).

**A.      Comparisons to Fair Value**

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Celik Halat's sales of subject merchandise from Turkey to the United States during the period of investigation (POI) were made at LTFV, Commerce compared the export price (EP) to the normal value (NV), as described in the "Export Price," and "Normal Value" sections below.

1.      Determination of Comparison Method

Pursuant to section 777A(d)(1)(A) of the Act and 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average EPs or constructed export prices (CEPs), *i.e.*, the average-to-average method, unless the Secretary determines that another method is appropriate in a particular situation.  In LTFV investigations, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales, *i.e.*, the average-to-transaction method, as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous AD investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-average method is appropriate in a particular situation pursuant to 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[10]  Commerce finds the differential pricing analysis to be instructive for purposes of examining whether to apply an alternative comparison method in this proceeding.

---

[10] *See, e.g., Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

The differential pricing analysis we applied examines whether there exists a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all export sales by purchasers, regions, and time periods to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code, *i.e.*, zip code, and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POI based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean, *i.e.*, weighted-average price, of a test group and the mean, *i.e.*, weighted-average price, of a comparison group. First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices

to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test:  small, medium, or large (0.2, 0.5, and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large, *i.e.*, 0.8, threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test.  If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage, *i.e.*, the Cohen's *d* test and the ratio test, demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison

method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only. If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

2.      Results of the Differential Pricing Analysis

Based on the results of the differential pricing analysis, we find that 59.38 percent of Celik Halat's U.S. sales, by value, pass the Cohen's *d* test,[11] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. However, we determine that there is no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-

---

[11] *See* Memorandum, "Margin Calculations for Celik Halat Pursuant to Final Results of Redetermination," dated concurrently with this redetermination (Final Remand Sales Calculation Memorandum) at 3.

average method to those sales which did not pass the Cohen's *d* test.  Thus, for these final results of redetermination, Commerce is applying the average-to-average method to all U.S. sales to calculate the weighted-average dumping margin for Celik Halat.

**B.      Product Comparisons**

In accordance with section 771(16) of the Act, we considered all products produced and sold by Celik Halat in Turkey during the POI that fit the description of the scope of investigation in the *Final Determination* to be foreign like products for purposes of determining appropriate product comparisons to U.S. sales.  We compared U.S. sales to sales made in the home market, where appropriate.  Where there were no sales of identical merchandise in the home market made in the ordinary course of trade to compare to U.S. sales, according to section 771(16)(B) of the Act, we compared U.S. sales to sales of the most similar foreign like product made in the ordinary course of trade.

In making product comparisons, we matched foreign like products based on the physical characteristics reported by Celik Halat in the following order of importance:  cover, diameter, grade, strand, and type.

**C.      Date of Sale**

Section 351.401(i) of Commerce's regulations states that, in identifying the date of sale of the merchandise under consideration (MUC) or foreign like product, Commerce normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  Additionally, Commerce may use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[12]  Commerce has a long-standing practice of finding that, where

---

[12] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[13]

Celik Halat reported the date of sale as the earlier of shipment or invoice date for both its home market and U.S. sales.[14]  Accordingly, because Celik Halat's reporting is consistent with Commerce's practice, we relied on Celik Halat's reported date of sale for all home market and U.S. sales.

### D.      Export Price

For all U.S. sales made by Celik Halat, we used EP methodology, in accordance with section 772(a) of the Act, because the subject merchandise was first sold by the producer/exporter outside of the United States directly to the first unaffiliated purchaser in the United States prior to importation and CEP methodology was not otherwise warranted.

We calculated EP based on packed prices to unaffiliated purchasers in the United States. We made deductions, where appropriate, from the starting price for billing adjustments.[15]  We also made deductions from the starting price, where appropriate, for movement expenses, *i.e.*, foreign inland freight expenses, foreign brokerage and handling expenses, foreign inland insurance expenses, and international freight expenses,[16] in accordance with section 772(c)(2)(A) of the Act.

---

[13] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying Issues and Decision Memorandum (IDM) at Comment 10; and *Notice of Final Determination of Sales at Less Than Fair Value:  Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[14] *See* BCQR at section B, page 15, and section C, page 11.

[15] *See* Comment 3, below, for further discussion of this adjustment.

[16] *See* Comment 2, below, for further discussion of this expense.

**E.      Normal Value**

1.      Home Market Viability

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act.  If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV (*i.e.*, the aggregate volume of home market sales of the foreign like product is five percent or more of the aggregate volume of U.S. sales), we compared the volume of Celik Halat's home market sales of the foreign like product to the volume of its U.S. sales of subject merchandise, in accordance with section 773(a)(1)(A) and (B) of the Act and 19 CFR 351.404.

Based on this comparison, we determined that, pursuant to 19 CFR 351.404(b), the aggregate volume of Celik Halat's home market sales of the foreign like product was greater than five percent of the aggregate volume of its U.S. sales of the subject merchandise. Therefore, we used home market sales as the basis for NV, in accordance with section 773(a)(1)(B) of the Act.

2.      Level of Trade

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales.  Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[17]  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[18]  In order to determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, we examine the distribution system in each market, *i.e.*, the chain of distribution, including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales, *i.e.*, NV based on either home market or third country prices,[19] we consider the starting prices before any adjustments.  For CEP sales, we consider only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[20]

When Commerce is unable to match sales of the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may compare the U.S. sale to sales at a different LOT in the comparison market.  In comparing EP or CEP sales to sales at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.

---

[17] *See* 19 CFR 351.412(c)(2).
[18] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM at Comment 7.
[19] Where NV is based on constructed value (CV), we determine the NV LOT based on the LOT of the sales from which we derive selling, general, and administrative expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).
[20] *See Micron Tech., Inc. v. United States*, 243 F. 3d 1301, 1314-16 (Fed. Cir. 2001).

Celik Halat, in its questionnaire response, provided information regarding the marketing stages involved in making its reported home market and U.S. sales, including a description of the selling activities performed for each channel of distribution.[21]  Selling activities can generally be grouped into five categories for our analysis:  Provision of Sales Support,[22] Provision of Training Services,[23] Provision of Technical Support,[24] Provision of Logistical Services,[25] and Performance of Sales Related Administrative Activities.[26]

In the home market, Celik Halat reported that it made sales through two channels of distribution:  (1) sales to unaffiliated wholesalers/trading companies that resell to end-users; and (2) direct sales to end users.[27]  Celik Halat stated that it performed the following selling activities at the same level of intensity for all of its reported home market sales:  sales forecasting; customer visits and meetings; logistical services; and order input/processing activities.  In addition, Celik Halat stated that it also performed technical support activities for channel 1 sales.[28]  Accordingly, based on the selling function categories noted above, we find that Celik Halat provided sales support, logistical services, and sales-related administrative activities for all of its home market sales, and additionally provided technical support for its channel 1 sales.

---

[21] *See* Celik Halat's Letter, "Section A Response of Celik Halat ve Tel Sanayi A.S." ("CELIK HALAT") for Section A in the AD investigation," dated July 17, 2020 (AQR) at A-11-A-14 and Exhibit A-7; and Celik Halat's Letter, "Response of Celik Halat ve Tel Sanayi A.S. ("CELIK HALAT") to the Supplemental Section A Questionnaire," dated August 7, 2020 (SQRA) at 4-6.

[22] *See* AQR at Exhibit A-7.  The Provision of Sales Support can include:  sales forecasting, strategic/economic planning, advertising, sales promotion, sales/marketing support, market research, and other related activities.  *See Acetone from Belgium:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 49999 (September 24, 2019), and accompanying Preliminary Decision Memorandum at 17.

[23] *See* AQR at Exhibit A-7.  The Provision of Training Services can include:  personnel training/exchange, distributer/dealer training, and other related activities.

[24] *Id.*  The Provision of Technical Support can include:  engineering services, technical assistance, and other related activities.

[25] *Id.*  The Provision of Logistical Services can include:  inventory maintenance, post-sale warehousing, repacking, freight and delivery, and other related activities.

[26] *Id.*  The Performance of Sales Related Administrative Activities can include:  order input/processing, rebate programs, warranty service, and other related activities.

[27] *Id.* at A-11.

[28] *Id.* at A-11-A12; and SQRA at 4-5.

Because we find that the additional technical support services performed for some of Celik Halat's home market customers are not significant enough to warrant a separate LOT, we find that Celik Halat performed similar selling activities to sell to all of its home market customers; consequently, we determine that there is one LOT in the home market for Celik Halat.[29]

With respect to the U.S. market, Celik Halat reported that it made sales through one channel of distribution (*i.e.*, sales to an unaffiliated trading company).[30]  Celik Halat stated that it performed the following selling activities at the same level of intensity for all of its U.S. sales: sales forecasting; market research; logistical services; and order input/processing.[31]

Accordingly, based on the selling function categories noted above, we find that Celik Halat provided sales support, logistical services, and sales related administrative activities for all of its U.S. sales.  Because we find that there were no differences in the selling activities Celik Halat performed to sell to its U.S. customers, we determine that all U.S. sales are at the same LOT.

Finally, we compared the U.S. LOT to the home market LOT, and we find that the selling functions Celik Halat performed for its U.S. and home market customers do not differ significantly.  Therefore, we determine that Celik Halat's sales to the United States and home market during the POI were made at the same LOT and, as a result, no LOT adjustment is warranted.

3.      Cost of Production Analysis

In accordance with section 773(b)(2)(A) of the Act, Commerce required that Celik Halat provide CV and cost of production (COP) information to determine if there were reasonable

---

[29] *Id.*  In addition, we note that Celik Halat neither claimed its sales were made at different LOTs, nor provided the quantitative analysis Commerce requested in the AD questionnaire.  *See* AQR at 13-14.
[30] *See* AQR at A-11.
[31] *Id.* at A-12 and Exhibit A-7; and SQRA at 4-5.

grounds to believe or suspect that sales of the foreign like product had been made at prices that represented less than the COP of the product.  We examined Celik Halat's reported cost data and determined that our quarterly cost methodology is not warranted.  In addition, we determined, in comparing the Turkish producer price index (PPI) figures for the first month of the POI with the last month of the POI, that the change in the PPI did not meet the 25 percent threshold for high inflation.[32]  Therefore, we are applying our standard methodology of using annual costs based on Celik Halat's reported data.

a.      Calculation of COP

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of costs of materials and fabrication for the foreign like product, plus amounts for general and administrative (G&A) and interest expenses.  We relied on the COP data Celik Halat reported, except as follows:[33]

- We revised the reported G&A expenses to include certain expense items from Celik Halat's fiscal year 2019 financial statements;[34] and
- We revised the reported scrap offset to reflect the quantity of scrap generated in the production of the MUC  .[35]

b.      Test of Comparison Market Sales Prices

On a product-specific basis, pursuant to section 773(b) of the Act, we compared the adjusted weighted-average COPs to the comparison market sales prices of the foreign like

---

[32] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Draft Results of Redetermination– Celik Halat ve Tel Sanayi A.S.," dated May 14, 2022 (Draft Results COP Calculation Memorandum), for further discussion.

[33] *Id.*; and Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Results of the Redetermination– Celik Halat ve Tel Sanayi A.S.," dated concurrently with this redetermination (Final Remand COP Calculation Memorandum).

[34] *See* Comment 4, below, for further discussion of the adjustments made to G&A expenses.

[35] *See* Comment 5, below, for further discussion of this offset.

product, in order to determine whether the sales prices were below the COPs.  For purposes of

this comparison, we used COPs exclusive of selling and packing expenses.  The sales prices

were exclusive of any applicable billing adjustments, movement charges, direct and indirect

selling expenses,[36] and packing expenses.

c.      Results of the COP Test

In determining whether to disregard comparison market sales made at prices below the

COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether:  (1)

within an extended period of time, such sales were made in substantial quantities; and (2) such

sales were made at prices which permitted the recovery of all costs within a reasonable period of

time in the normal course of trade.  In accordance with sections 773(b)(2)(B) and (C) of the Act,

where less than 20 percent of the respondent's comparison market sales of a given product are at

prices less than the COP, we do not disregard any below-cost sales of that product because we

determine that in such instances the below-cost sales were not made within an extended period of

time and in "substantial quantities."  Where 20 percent or more of a respondent's sales of a given

product are at prices less than the COP, we disregard the below-cost sales when:  (1) they were

made within an extended period of time in "substantial quantities," in accordance with sections

773(b)(2)(B) and (C) of the Act; and, (2) based on our comparison of prices to the weighted-

---

[36] We revised Celik Halat's reported home market indirect selling expenses as a ratio based on sales value, which we then applied to its reported gross unit price.  *See* Memorandum, "Margin Calculations for Celik Halat Pursuant to Draft Results of Redetermination," dated March 14, 2022 (Draft Remand Sales Calculation Memorandum) for further discussion.  We also revised the indirect selling expense ratio to include the provision expenses for bad and doubtful accounts receivables.  *See* Comment 4, below, for further discussion; *see also* Final Remand Sales Calculation Memorandum at 2 and Attachment 3.

average COPs for the POI, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that, for certain products, more than 20 percent of Celik Halat's home market sales during the POI were at prices less than the COP and, in addition, such sales did not provide for the recovery of costs within a reasonable period of time. Therefore, we excluded these sales and used the remaining sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

## F.   Calculation of NV Based on Comparison Market Prices

We calculated NV for Celik Halat based on delivered prices to unaffiliated customers. We made deductions, where appropriate, from the starting price for foreign inland freight expenses and insurance expenses, where appropriate, under section 773(a)(6)(B)(ii) of the Act.

We deducted home market packing costs and added U.S. packing costs, in accordance with section 773(a)(6)(A) and (B) of the Act. For comparisons to EP sales, we made adjustments under section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410 for differences in circumstances of sale. Specifically, we deducted direct selling expenses incurred for home market sales, *i.e.*, credit expenses, and added U.S. direct selling expenses, *i.e.*, credit expenses and bank charges. Because Celik Halat calculated its U.S. credit expenses using a Euro-denominated borrowing rate,[37] we recalculated these expenses using the average prime rate published by the Federal Reserve during the POI,[38] consistent with our practice.[39]

---

[37] *See* BCQR at Exhibit C-7.

[38] *See* Draft Remand Sales Calculation Memorandum at 2 and Attachment 3.

[39] *See, e.g., Thermal Paper from Germany:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 54152 (September 30, 2021), and accompanying IDM at Comment 7.

When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for differences in costs attributable to differences in the physical characteristics of the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411.  We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and subject merchandise.[40]

## G.   Currency Conversion

We made currency conversions into U.S. dollars in accordance with section 773A of the Act and 19 CFR 351.415(a), based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

## IV.   INTERESTED PARTY COMMENTS

On March 14, 2022, Commerce released the draft results of redetermination to all interested parties, and invited parties to comment.[41]  On March 17, 2022, Celik Halat and the petitioners filed comments on the Draft Results.[42]  On March 21, 2022, Celik Halat and the petitioners filed rebuttal comments.[43]  We address these comments below:

## Comment 1:  Application of Total Adverse Facts Available (AFA)

*Petitioners' Comments*

- Celik Halat has significantly impeded Commerce's investigation by withholding information, submitting information that cannot be verified, and failing to cooperate to

---

[40] *See* 19 CFR 351.411(b).

[41] *See Celik Halat ve Tel Sanayi A.S. v. United States*, Consol. Court No. 21-00045, Slip Op. 22-12 (CIT February 15, 2022), Draft Results of Redetermination Pursuant to Court Remand**,** dated March 14, 2022 (Draft Results).

[42] *See* Celik Halat's Letter, "Comments on Draft Redetermination of Celik Halat ve Tel Sanayi A.S.," dated March 17, 2020 (Celik Halat's Comments); and Petitioner's Letter, "Petitioners' Comments on Draft Redetermination Pursuant to Court Remand," dated March 17, 2022 (Petitioners' Comments).

[43] *See* Celik Halat's Letter, "Comments on the Petitioner's Comments (Rebuttal Brief) on Draft Redetermination of Celik Halat ve Tel Sanayi A.S.," dated March 21, 2022 (Celik Halat's Rebuttal Comments); and Petitioners' Letter, "Petitioners' Rebuttal to Celik Halat's Comments on Draft Redetermination," dated March 21, 2022 (Petitioners' Rebuttal Comments).

the best of its ability.  Therefore, Commerce should assign Celik Halat a dumping margin based on total AFA.[44]

- Celik Halat failed to submit its complete audited financial statements and complete sales reconciliations in both its original questionnaire response and ILVQR, despite being instructed to do so.  The statute requires Commerce to rely on Celik Halat's costs, to the extent they comply with the generally accepted accounting principles (GAAP) of the exporting country.  Due to Celik Halat's failure to submit this information, Commerce cannot determine if Celik Halat's costs comply with Turkish GAAP.[45]

- The Court's remand does not preclude Commerce from applying AFA to the substance of Celik Halat's response.  The Supreme Court has recognized that agencies have the discretion to decide how to proceed in light of the evidence on the record.[46]

*Celik Halat's Rebuttal Comments*

- Any application of AFA would be contrary to the Court's instruction not to apply AFA and to calculate a non-AFA margin from the data on the record.[47]

- Celik Halat did its best to provide all documents necessary to reconcile the home market and U.S. sales databases.  However, Celik Halat could not obtain translations of its audited financial statements before the deadline to submit the ILVQR.  Nonetheless, even without full translations of the audited financial statements, the record supports Celik Halat's reconciliations.[48]

---

[44] *See* Celik Halat's Comments at 2.
[45] *Id*. at 3-4 (citing AQR at 20; and ILVQR at 18).
[46] *Id*. at 4 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 544 (Supreme Court 1978)).
[47] *See* Celik Halat's Rebuttal Comments at 1.
[48] *Id*. at 2.

*Commerce's Position:*

Section 776(a) of the Act directs that Commerce shall use the facts otherwise available in reaching a determination if:  (1) necessary information is not available on the record; or (2) an interested party or another other person; (A) withholds information that has been requested by the administering authority or the Commission under this title; (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested subject to subsection(c)(1) and (e) of section 782; (C) significantly impedes a proceeding under this title; or (D) provides such information that cannot be verified as provided in section 782(i).  Further, section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interest of that party in selecting from the facts otherwise available.

In this case, we find that basing Celik Halat's margin for these final results of redetermination on the application of AFA under section 776(b) of the Act is not warranted. Specifically, we find that the necessary information, except as discussed below in Comment 2, is available on the record of this investigation, and Celik Halat has not withheld information, failed to provide information within established time limits, significantly impeded this proceeding, or provided information that cannot be verified.  We find that Celik Halat has cooperated with Commerce's requests for information in this remand proceeding and that it has answered each request for information to the best of its ability.  Therefore, we find no basis to apply facts available or facts available with an adverse inference here.

In accordance with section 773(f)(1)(A) of the Act, Commerce will normally calculate costs based on the records of the producer of the merchandise, if such records are kept in

accordance with the GAAP of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise.[49]  While Celik Halat acknowledges that it did not submit its fully translated audited financial statements in its ILVQR, Commerce is nonetheless able to rely on the information Celik Halat submitted to validate its reporting. Specifically, Celik Halat submitted its income statement that it is required to submit as an attachment to its tax returns.[50]  According to Celik Halat, this income statement is the same as the income statement included in its audited financial statements.[51]

Additionally, we find that Celik Halat provided documentation to support its home market and U.S. sales reconciliations.  Specifically, in addition to the income statement noted above, Celik Halat submitted its trial balance both in its initial questionnaire response and in its ILVQR.[52]  Thus, we were able to tie Celik Halat's reported sales information through its trial balance to its income statement and, as a result, we find that we are able to reconcile Celik Halat's reported sales information to its accounting system.[53]

Therefore, based on the information on the record, we determine that the application of total AFA to Celik Halat to determine its dumping margin in this proceeding is not warranted. Consequently, we continued to rely on Celik Halat's reported sales and cost information to calculate its weighted-average dumping margin for these final results of redetermination.

---

[49] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value:  Light-Weight Rectangular Pipe and Tube from Mexico*, 73 FR 35649 (June 24, 2008), and accompanying IDM at Comment 10.
[50] *See* ILVQR at 2 and Exhibit R-7 .
[51] *Id.*
[52] *See* BCQR at Exhibits B-2.i, B-2.ii and B-2.iii; *see also* ILVQR at Exhibits R-4.a, R-4.b and R-4.c.
[53] *See* ILVQR at 1-4 and Exhibits R-1, R-2, R-3.a, R-3.b, R-3.c, R-4.a, R-4.b, R-4.c, R-5, R-6, and R-7.

**Comment 2:  Celik Halat's Reporting of International Freight Expenses**

*Petitioners' Comments*

- Celik Halat failed to report foreign inland freight and international freight expenses as Commerce instructed.  Specifically, Celik Halat failed to report:  (1) foreign inland freight expenses separately; and (2) international freight expenses based on the actual freight expenses incurred.

- Celik Halat claims that foreign inland freight expenses are included in the freight supplier's invoices, which cover all transportation services, but provided no documentary evidence for the claim.[54]  Celik Halat only provided commercial sales invoices to its customer as support for its international movement expenses, which include a separate line item for freight charges.[55]  Thus, Celik Halat reported international freight expenses based on the freight revenue reported on the invoice, rather than the actual freight expenses incurred.

- Consequently, Celik Halat failed to provide either documentation to support its reported international freight expenses or to tie each of its reported movement expenses to its general ledger and trial balance, as Commerce specifically instructed.[56]

- Celik Halat's failure to provide support for its international freight expenses has made it impossible for Commerce to determine whether Celik Halat reported the actual sales-specific freight expenses it incurred from its freight supplier.  Therefore, because Celik Halat failed to cooperate to the best of its ability in reporting international freight

---

[54] *See* Petitioner's Comments at 6 (citing BCQR at section C, pages 21 and 23, and Exhibit C-1).
[55] *Id*. at 6-7 (citing BCQR at 23).
[56] *Id*. at 7-9 (citing ILV Questionnaire; and ILVQR at 5 and 8-11).

expenses, Commerce should assign the highest per-unit expense amount reported to all U.S. sales as partial AFA.

*Celik Halat's Rebuttal Comments*

- Foreign inland freight expenses on U.S. sales were reported as part of reported international freight expenses because Celik Halat's freight provider invoices the company once for all transportation expenses from the plant to the U.S. port.[57]

- In the ILVQR, Celik Halat did not identify the freight charges for the U.S. sales Commerce selected given the time frame for responding to the questionnaire; however, Celik Halat submitted several commercial invoices for export sales to demonstrate that freight expenses are billed as a separate line item.[58]

*Commerce's Position:*

We agree with the petitioners that Celik Halat failed to provide adequate support for the reported international freight expenses incurred on its U.S. sales, as Commerce specifically requested.  Accordingly, as partial AFA, we assigned the highest per-unit international freight expense amount Celik Halat reported in its U.S. sales database to all of its U.S sales.

Commerce in the initial questionnaire instructed Celik Halat to "{r}eport the unit cost of ocean freight or air freight <u>incurred</u> on shipments from the port of exit in the country of manufacture to the U.S. port of entry."[59]  In response, Celik Halat reported that "{t}he freight

---

[57] *See* Celik Halat's Rebuttal Comments at 2 (citing ILVQR at Exhibit R-19).
[58] *Id*. (citing ILVQR at Exhibit R-20).
[59] *See* Commerce's Letter, Initial Questionnaire, dated June 19, 2020 at C-19 (emphasis added).

charge that CELIK HALAT pays for the transportation of the merchandise from the factory to the U.S. port is stated on the commercial invoice."[60]

As part of its normal verification procedures, Commerce requested that Celik Halat provide a complete set of documents for each sale selected for examination, including "{i}nvoices and records of payment for transaction-specific charges and/or adjustments."[61]  With respect to Celik Halat's reported international freight expenses,[62] Commerce specifically requested that Celik Halat provide the following additional support for its reported movement expenses:

> For each of the selected home market and U.S. sales identified above, tie each of the reported movement expenses to Celik Halat's general ledger and trial balance. Provide documentation from Celik Halat's accounting system demonstrating these amounts.[63]

Therefore, based on Commerce's specific instructions in the ILV Questionnaire, Celik Halat was notified  of the documentation Commerce required to verify its reported international freight expenses.  However, in its response to the ILV Questionnaire, Celik Halat failed to

---

[60] *See* BCQR at section C, page 23.  At Exhibit A-9 of the AQR, Celik Halat included a commercial invoice to the U.S. customer that includes a separate line item for the freight amount.  This invoice is also included in Exhibit R-20 of the ILVQR.  Celik Halat provided no other information in its questionnaire responses to support the international freight expenses reported in its U.S. sales database.
[61] *See* ILV Questionnaire at 3-4.
[62] *See* Petitioners' February 25 Comments at 18.
[63] *See* ILV Questionnaire at 5.  We identified these expenses as INLFTCH and INSUREH for home market sales and DBROKU, INTNFRU, and INSUREU for U.S. sales.

comply with Commerce's instructions.[64]  Specifically, for the sales Commerce selected for examination, in the ILVQR Celik Halat failed to:

- provide the requested invoices and records of payment for international freight expenses;[65]
- tie the reported international freight expenses incurred to Celik Halat's general ledger and trial balance;[66] and
- provide documentation from Celik Halat's accounting system to support the reported international freight expenses.[67]

As a result of these failures, Commerce is unable to determine whether the international freight expense amounts Celik Halat reported, based on the amounts shown on its commercial invoices, accurately reflect the actual international freight expenses it incurred to ship the subject merchandise.  As a result, Commerce was unable to verify the reported information.[68]

Sections 776(a)(2)(D) of the Act provides that, if an interested party provides necessary information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination.  Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the

---

[64] We disagree with Celik Halat that we provided the company with insufficient time to respond to the ILV Questionnaire.  Celik Halat was aware of Commerce's intention to issue the ILV Questionnaire and received a partial extension permitting additional time to prepare.  Moreover, Celik Halat received the same amount of time to respond to the ILV Questionnaire as respondents in both investigations and administrative reviews normally receive since Commerce suspended in-person verifications.  *See* Commerce's Letter, Extension of ILV Questionnaire Deadline, dated March 3, 2022.  Despite the additional time provided, Celik Halat failed to provide any documentation to support its reported international freight expense amounts.

[65] *See* ILV Questionnaire at 8 and 10.

[66] *Id.* at 11.  As noted above, Celik Halat acknowledged that it failed to provide the actual freight charges for the sales Commerce selected in the ILVQR.  *See* Celik Halat's Rebuttal Comments at 2.

[67] *Id.*

[68] We disagree with the petitioners that Celik Halat should have reported foreign inland freight expenses as a separate expense.  *See* BCQR at section C, page 21; and ILVQR at Exhibit R-19.  Commerce makes an adjustment for <u>all</u> reported U.S. movement expenses pursuant to section 776(a)(2)(A) of the Act and the separation of these expenses would not affect the margin calculation.

applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

In light of the above, the application of facts available is appropriate pursuant to section 776(a)(2)(A) of the Act because the necessary information Celik Halat provided (*i.e.*, the international freight expenses it incurred, which are necessary for Commerce to make an adjustment to EP under section 772(c)(2)(A) of the Act), cannot be verified.

Moreover, we find that Celik Halat's failure to provide documentation to support its reported international freight expenses in the manner requested, using the records over which it maintained control, indicates that Celik Halat did not act to the best of its ability to comply with our requests for information.  Therefore, in accordance with section 776(b) of the Act, we find that it is appropriate to apply partial AFA in making a deduction for movement expenses to EP under section 776(a)(2)(A) of the Act.  As partial AFA, we identified the highest reported per-unit amount for international freight expenses in Celik Halat's U.S. sales database and applied that amount as the international freight expenses for all of Celik Halat's reported U.S. sales.[69]

## Comment 3:  Celik Halat's Reporting of Per-Unit Credit Note Amounts

*Petitioners' Comments*

- Celik Halat reported granting price adjustments on certain U.S. sales through credit notes issued to its U.S. customers and calculated the per-unit amount (CRDNOTEU) based on the percentage of the credit note to the total invoice value.  Celik Halat's calculation methodology is incorrect.[70]

---

[69] *See* Final Remand Sales Calculation Memorandum at 2.
[70] *See* Petitioners' Comments at 9-10 (citing BCQR at section C, page 16); *see also* BCQR at Exhibit C-4.

- Commerce should revise the calculation of the CRDNOTEU price adjustment by dividing the total credit note value by the total sales quantity of the invoice.[71]

*Celik Halat's Rebuttal Comments*

- The methodology used to calculate the per-unit amount of the credit note is correct and no revision is required.[72]

*Commerce's Position:*

We have continued to accept Celik Halat's methodology for reporting its per-unit price adjustments for these final results of redetermination.[73] We find that, not only is Celik Halat's methodology reasonable, but it is also mathematically equivalent to the methodology the petitioners propose.

**Comment 4:  Adjustments to Celik Halat's G&A Expenses**

*Celik Halat's Comments*

- Commerce revised Celik Halat's G&A expense ratio calculation in the Draft Results to add provision expenses, other ordinary expenses and losses, and non-operating expenses and losses to the numerator of the calculation.[74]  Commerce should exclude these items from the calculation of the G&A expense ratio because they are not related to Celik Halat's operations or production of the subject merchandise during the POI.

- Specifically, the provision expenses are for pre-POI bad and doubtful debts.  The ordinary expenses and losses relate to a write-off for fixed assets; such write-offs are not

---

[71] *Id.* at 10 and Attachment 1.
[72] *See* Celik Halat's Rebuttal Comments at 3 (citing BCQR at Exhibit C-4).
[73] However, we determined that Celik Halat made certain rounding errors in its CRDNOTEU calculations. Accordingly, we revised Celik Halat's calculations to eliminate these rounding errors.  *See* Final Remand Sales Calculation Memorandum at Attachment 4.
[74] *See* Celik Halat's Comments at 2-3; *see also* Draft Results at 14; and Draft Results COP Calculation at 1-2 and Attachment 2.

done annually and, thus, are not done in the ordinary course of business. The non-operating expenses and losses relate to the depreciation of assets when not in use, and are properly treated as extraordinary expenses under Turkish GAAP.[75]

*Petitioners' Rebuttal Comments*

- Celik Halat does not cite any record evidence in support of its argument that the bad and doubtful debt write-offs relate to pre-POI debts. Celik Halat also failed to cite record evidence that the other ordinary expenses and losses associated with the write-offs of fixed assets are not performed on an annual basis, and that the non-operating expenses and losses related to depreciation expenses on assets that were not in commercial use.

- Because Celik Halat recorded these expenses in its normal accounting books and records, Commerce should affirm its Draft Results to include these items in its final results of redetermination.[76]

*Commerce's Position:*

Consistent with the Draft Results, we continue to include both other ordinary expenses and losses and non-operating expenses and losses in the numerator of the G&A expense ratio.[77] However, for these final results of redetermination, we removed the provision expense related to bad and doubtful debts from the calculation of the G&A numerator and, instead, included these expenses as part of indirect selling expenses.

Celik Halat contends that the other ordinary expenses and losses relate to the write-offs of fixed assets that are not part of the company's general operations and should not be included in

---

[75] *Id.* (citing ILVQR at 17-18).
[76] *See* Petitioners' Rebuttal Comments at 3 (citing Celik Halat's Letter, "Response of Celik Halat ve Tel Sanayi A.S. ("Celik Halat") to the Section D Questionnaire," dated August 13, 2020 (DQR), at Exhibit D-8.4; and *Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Determination Not To Revoke the Order in Part*, 64 FR 69694, 69699 (December 14, 1999)).
[77] *See* Draft Results at 14; and Draft Remand COP Calculation Memorandum at 2-3.

the G&A expenses.  Celik Halat also claims that non-operating expenses and losses relate to depreciation expenses associated with assets that were not commercially used and, thus, should not be included in the G&A expenses.  We disagree.

According to Celik Halat, the other ordinary expenses and losses are write-offs occurring upon the physical verification of the fixed assets.[78]  Physical verification of assets, and the notation of impairment, is related to the routine disposal of fixed assets, and not associated with the sale or disposal of an entire facility.  It is not unusual for a manufacturing company, which has extensive amounts of machinery and equipment, to routinely replace, sell, or dispose of minor amounts of such fixed assets from year to year.  Since these ordinary expenses are not included in the cost of sales, they do not relate to any specific product or division.  Rather, the gains and losses on routine disposal or sale of fixed assets relate to the general operations of the company as a whole and, thus, are appropriately included in the G&A expenses.[79]  In addition, since the cost of maintaining or continuing to hold idle assets does not directly relate to the production of a particular product (*i.e.*, the assets have not been used to produce any products during the period), Commerce considers the cost of holding idle assets, such as those not commercially used during the POI, as period costs that relate to the company as a whole.  Accordingly, our practice is to include depreciation expenses on idle assets as part of the calculation of the G&A expense ratio.[80]

Further, Celik Halat argues that the depreciation expenses in question are recorded only for tax purposes, and not under Turkish GAAP.[81]  However, Celik Halat itself states that the

---

[78] *See* ILVQR at 17.
[79] *See Notice of Final Results of Antidumping Duty Administrative Review:  Certain Softwood Lumber Products from Canada*, 70 FR 73437 (December 12, 2005), and accompanying IDM at Comment 8.
[80] *See Silicomanganese from India:  Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances Determination*, 67 FR 15531 (April 2, 2002), and accompanying IDM at Comment 14.
[81] *See* Celik Halat's Comments at 3.

standalone financial statements relied upon in the normal course of business and for reporting purposes "are prepared as per the Turkish GAAP and are audited by a certified public accountant before submission to the tax authorities."[82]  Thus, based on record evidence, these depreciation expenses are related to idle assets and are recorded in Celik Halat's normal books and records prepared in accordance with Turkish GAAP; therefore, we find it appropriate to continue to include these expenses as part of the calculation of the G&A expense ratio.[83]

Finally, with respect to the provision expenses related to bad and doubtful accounts receivable, Commerce's practice is to include such expenses, which reflect a company's estimate based on its prior experience with non-payment by customers, as part of indirect selling expenses.[84]  Accordingly, we revised the calculations of Celik Halat's:  (1) G&A expense ratio to remove these expenses;[85] and (2) indirect selling expense ratio to include these expenses.[86]

**Comment 5:  Adjustment to Scrap Offset**

*Celik Halat's Comments*

- Commerce improperly revised Celik Halat's calculation of its reported scrap offset to reflect the quantity of scrap that could have been generated during POI production, reducing the reported scrap offset.[87]  Commerce's recalculation is incorrect because it did not properly consider or understand how Celik Halat reported its scrap offset calculation.

---

[82] *See* DQR at 9.
[83] *See* Final Remand COP Calculation Memorandum at Attachment 2.
[84] *See, e.g., Notice of Final Results of Antidumping Duty Administrative Review:  Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Brazil*, 70 FR 7243 (February 11, 2005), and accompanying IDM at Comment 6; *see also Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review*, 70 FR 73444 (December 12, 2005), and accompanying IDM at Comment 3.
[85] *See* Final Remand COP Calculation Memorandum at Attachment 2.
[86] *See* Final Remand Sales Calculation Memorandum at 2 and Attachment 3.
[87] *See* Celik Halat's Comments at 2-3; *see also* Draft Results at 14; and Draft Results COP Calculation Memorandum at 2 and Attachment 3.

- Commerce's assumption that merchandise not under consideration (non-MUC) generates a significantly larger quantity of scrap than MUC is flawed and not substantiated by record evidence.

- Commerce failed to consider the manner in which Celik Halat records both the scrap it generated and its scrap sales during the POI.  In addition, Commerce wrongly considered a single summary calculation related to the overall yield without accounting for the changes in the inventory of semi-finished goods in the calculation of the overall yield ratio, included, for example, in CONNUM-specific worksheets.[88]

- Record evidence shows for one product that Celik Halat's methodology resulted in an understatement of the scrap offset; thus, for that product Celik Halat reported a higher COP.

- Further, Commerce recalculated Celik Halat's scrap offset without requesting that Celik Halat clarify or provide further information regarding this adjustment.  Thus, this action was inconsistent with Commerce's practice and the Court's decision in *Celik Halat*.

- Therefore, Commerce should accept Celik Halat's scrap offset as reported in the calculation of COP.

*Petitioners' Rebuttal Comments*

- Commerce correctly explained that, under its normal methodology, a scrap offset should be based on the quantity of scrap generated during the production of MUC, and valued at the weighted-average sales price during the POI.

- Celik Halat claims that its cost accounting system does not record the scrap generated at each production stage for individual products.  Because Celik Halat's methodology

---

[88] *See* Celik Halat's Comments at 4-5 (citing DQR at 25 -26, 29-30, and Exhibits D-6, D-7, D-9, D-11, and D-12).

deviated from its standard methodology, Commerce tested the reasonableness of the reported scrap allocation and properly concluded that an adjustment was warranted.[89]

- Celik Halat's claim that the two CONNUM-specific cost worksheets and its other worksheets included in the DQR undermine Commerce's revised methodology is not persuasive, as each of its MUC and non-MUC products would have differing yield losses.

- Therefore, Commerce should continue to rely on its adjusted scrap offset in the final results of redetermination.

*Commerce's Position:*

We agree with the petitioners and find that it is appropriate to reduce Celik Halat's reported scrap offset to reflect the quantity of scrap that could have been generated during the production of MUC during the POI, consistent with our calculations for the Draft Results. Commerce's practice with respect to scrap offsets is to allow such offsets based on the amount of scrap generated, once the generated scrap has been demonstrated to have commercial value, through evidence of sales or reintroduction into the production process.[90]  Moreover, parties requesting a scrap offset have the burden of presenting to Commerce not only evidence that the scrap can be sold or reused in production, but also that they submitted all the information necessary for Commerce to incorporate such offsets into the margin calculation, and they demonstrated that their allocation methodology is reasonable.[91]

---

[89] *See* Petitioners' Rebuttal Comments at 7 (citing DQR at 24; and Draft Results COP Calculation Memorandum at 2).

[90] *See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 35245 (June 12, 2013), and accompanying IDM at Comment 10.

[91] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circums*tances, 74 FR 40485 (July 15, 2018), and accompanying IDM at Comment 34.

As discussed in the Draft Results, we reduced Celik Halat's reported scrap offset.[92]  Celik Halat's reported scrap offset was based on the amount of POI scrap generated during the production of MUC and non-MUC, valued based on the actual sales value, and allocated to both MUC and non-MUC products based on finished goods production quantities.[93]  We note, however, that Celik Halat produces a wide range of non-MUC products with differing yield losses.  Thus, we compared the input quantity of wire rod used to produce MUC to the finished goods production quantity of MUC to determine the amount of scrap that could have been generated in the production of MUC to test the reasonableness of the reported scrap allocation.[94]  This comparison showed that the claimed quantity of scrap generation associated with Celik Halat's reported scrap offset for MUC is higher than what could have been generated based on the reported yield loss related to the production of MUC.[95]  Therefore, record evidence clearly shows that the reported yield loss for the input steel wire rod used to produce MUC (*i.e.*, the input weight of wire rod used to produce the MUC compared to the output weight of the finished goods MUC), shows that the claimed scrap offset is significantly overstated.[96]  As such, we limited Celik Halat's reported scrap offset to the amount of scrap that could have possibly been generated in the production of MUC during the POI.

Celik Halat argues that record evidence shows that the allocation methodology used to determine its scrap offset is reasonable because, for one selected product, the reported scrap

---

[92] *See* Draft Remand Results at 14; and Draft Results COP Calculation Memorandum at 2 and Attachment 3.
[93] *See* DQR at Exhibit D-6.
[94] *See Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments and Final Partial Rescission; 2014-2015*, 82 FR 14344 (March 20, 2017), and accompanying IDM at Comment 6; *see also Certain Steel Nails from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 4770 (February 19, 2019), and accompanying IDM at Comment 1.
[95] *See* DQR at Exhibits D-6 and D-7.
[96] *Id.*

offset was understated, not overstated as Commerce's adjustment implies.[97]  However, this argument is without merit, because it validates that Celik Halat's allocation methodology is distortive.  Moreover, Celik Halat's argument does not rebut the fact that the overall scrap offset reported exceeds the amount of scrap that could have possibly been generated during the production of MUC.  Further, while Celik Halat attempts to defend its reported scrap offset as reasonable by stating that Commerce's assumption disregards the manner in which Celik Halat records its scrap sales and that the company is not able to record scrap generated during the POI for each product separately,[98] the fact remains that the reported scrap offset exceeds the amount of scrap that could have possibly been generated in the production of MUC during the POI given the yield loss that Celik Halat itself reported.[99]

Finally, Celik Halat contends that Commerce recalculated Celik Halat's scrap offset without requesting Celik Halat to clarify or provide further information regarding this adjustment.[100]  We disagree, as Commerce described the scrap offset adjustment in the Draft Results and subsequently provided Celik Halat an opportunity to comment on the Draft Results to support and justify its reported scrap offset.  Celik Halat addressed Commerce's scrap offset adjustment in its comments, but failed to demonstrate that its reported overall scrap offset for MUC is not overstated.  Accordingly, we continue to reduce Celik Halat's reported scrap offset adjustment consistent with our calculations in the Draft Results.[101]

---

[97] *See* Celik Halat's Comments at 4-5.
[98] *Id.*
[99] *See* DQR at Exhibits D-6 and D-7.
[100] *See* Celik Halat's Comments at 5.
[101] *See* Draft Results COP Calculation Memorandum at 2 and Attachment 3.

## V.   FINAL RESULTS OF REDETERMINATION

We recalculated Celik Halat's estimated weighted-average dumping margin according to the analysis described above.  As a result, the estimated weighted-average dumping margin is 17.88 percent.  Finally, because Commerce calculated a weighted-average dumping margin for Celik Halat, instead of basing the company's margin solely on section 776 of the Act, Commerce also revised the all-others rate for exporters and producers not individually examined to be 17.88 percent, in accordance with section 735(c)(5) of the Act.  Because Celik Halat's estimated weighted-average dumping margin calculated in these final results of redetermination is different from the dumping margin in the *Final Determination*, we intend to issue an amended final determination, should the Court sustain these final results of redetermination.

3/31/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance